In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-3389

SHAQUILLE GRIFFIN,

*Plaintiff-Appellant*,

*v.*

RICHARD BELL,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09-cv-06549—**Arlander Keys,** *Magistrate Judge.*

ARGUED JUNE 1, 2012—DECIDED SEPTEMBER 4, 2012

Before FLAUM, ROVNER and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge*. Shaquille Griffin, a Chicago public high school student, sued Richard Bell, a Chicago police officer who was working as a security supervisor at Griffin's school, for using excessive force in arresting Griffin. *See* 42 U.S.C. § 1983. A jury rejected Griffin's claim and found in favor of the officer. Griffin seeks a new trial, asserting that the district court conducted a flawed jury selection process and erred in excluding certain evidence. We affirm.

**I.**

On November 1, 2007, Griffin, a freshman at Corliss High School, arrived at school wearing blue jeans, a jacket and a baseball cap. Corliss has a dress code that requires students to wear white shirts and black pants and so Griffin was told to go home.[1] According to Officer Bell, as he accompanied Griffin out of the school, he asked Griffin to remove his hat. When Griffin did not comply, Officer Bell removed Griffin's cap, and handed it to him. Griffin put the hat back on, and Officer Bell removed it again, this time telling Griffin that he would return the hat when they reached the exit. At that point, Griffin struck Officer Bell in the face with his left hand. When Griffin attempted to hit Officer Bell a second time, a second security officer grabbed Griffin's arm. Officer Bell then told Griffin that he was under arrest, and managed to get one handcuff on Griffin before Griffin began to struggle with Bell.[2] The struggle continued for approximately twenty or thirty minutes before Officer Bell managed to get the second handcuff on Griffin. Other police officers then led him away. At trial, the second security officer, a teacher-librarian,

---

[1] The record does not reveal whether the uniform violation was the sole reason that Griffin was sent home. According to testimony at trial, Griffin was sent home approximately thirty minutes after arriving at the school.

[2] The other security officer was busy restraining Griffin's brother and two friends who tried to join the scuffle, and thus was unable to assist Officer Bell in arresting Griffin.

and a third security guard corroborated Officer Bell's version of the events.

Griffin told the jury a very different story. At trial, he acknowledged that he was not in compliance with the dress code that day.[3] He told the jury that he was headed to his locker to get his uniform when Officer Bell told him to remove his hat. Griffin testified that he complied with the officer's request but that the officer then grabbed him from behind and threw him into a wall. According to Griffin, the officer then head-butted him, knocking him to the floor in the process. The officer then handcuffed him and dragged him across the floor by the handcuffs. After Griffin managed to stand up again, the officer knocked him to the floor a second time. Once on the floor, Griffin told the jury, Officer Bell pounded his head into the floor whenever Griffin tried to raise his head, resulting in bruises to his face. Griffin's mother told the jury that he suffered an injury to his lip, "carpet burn on his face," and bruises all around his head.

Before trial, Bell moved *in limine* to exclude from evidence a short video of part of the incident. The two-minute video was recorded by Heather Brown, a friend of Griffin's, with either a cell phone or camcorder. Brown e-mailed the video to Griffin's lawyer, and the video

---

[3] At his deposition, Griffin testified that he was in uniform when he arrived at the school. After reviewing a short video of the incident prior to the trial, Griffin changed his story. We address the video *infra*.

was made available to Bell near the beginning of the
lawsuit. Four years passed between the incident and
the trial, and Griffin apparently lost track of Brown
during that time. Bell contended that, without presenting
Brown as a witness, the plaintiff could not establish a
proper foundation for the video. Bell also argued
that the video was confusing, misleading and unfairly
prejudicial because it showed only a small part of the
incident and included gaps where the camera was not
pointed at the struggle between Griffin and Bell. Without
Brown as a witness, Bell contended, there was no
way to determine whether the video was edited or why
certain parts of the struggle were not visible. For
example, the video did not show the beginning of the
altercation, when Griffin attacked Bell, but showed only
parts of the scuffle that appeared favorable to Griffin.
At the start of the video, Griffin is wearing one hand-
cuff with the second dangling from his wrist. Bell also
objected to the admission of still pictures extracted
from the video for similar reasons, although Bell agreed
that certain pictures could be used to refresh a witness's
recollection so long as they were not displayed to the
jury. The court ultimately decided to exclude the
video, excerpts from the video, and still photos created
from the video because the video lacked a proper founda-
tion, showed only part of the incident, and was
unfairly prejudicial.

After Griffin testified that he was not in uniform when
he arrived at school, Bell's attorney impeached him with
his deposition testimony to the contrary. Griffin's lawyer
wished to account for the inconsistency to the jury by

having his client explain that he had viewed the video before testifying at trial and that the video refreshed his recollection that he was wearing jeans and not black pants on the day of the incident. In keeping with the ruling excluding the video and all excerpts from it, the court ruled that Griffin's lawyer could not ask his client why his testimony was different at trial than it was at his deposition "if his answer will be that he viewed a video." Tr. at 210. Griffin now appeals the jury's verdict in favor of Officer Bell.

## II.

On appeal, Griffin complains that the district court applied an erroneous standard in denying challenges for cause to prospective jurors. He also contends that the court erred in refusing to allow him to use still photographs extracted from the video in his case-in-chief, in his cross-examination of defense witnesses, and in explaining to the jury how he refreshed his recollection before testifying at trial. Finally, he maintains that the court erred in allowing Officer Bell to testify that his actions in arresting Griffin complied with Chicago Police Department rules and regulations regarding arrests.

## A.

The district court rejected every challenge for cause that Griffin raised during the jury selection process. Griffin appeals the court's decision in three of those instances: jurors Susan Mahoney, Nadine Maamari, and

Tracey Carel. In each instance, Griffin argues that the juror indicated that she would give more credit to the testimony of a police officer than to that of a fourteen-year-old student. We review the district court's rulings on juror challenges for abuse of discretion.[4] *United States v. Fletcher*, 634 F.3d 395, 409 (7th Cir.), *cert. denied*, 132 S. Ct. 398 (2011) (because of the district court's ability to evaluate juror credibility during voir dire, we accord great deference to the court's ruling on a challenge for cause); *United States v. Hicks*, 635 F.3d 1063, 1067-68 (7th Cir. 2011) (same); *United States v. Scott*, 267 F.3d 729, 743 (7th Cir. 2001) (the process of empaneling a jury is left to the sound discretion of the trial judge, and we will not disturb the district court's rulings absent an abuse of discretion). Moreover, we will overturn a

---

[4] Griffin's lawyer initially omitted from his required short appendix the district court's oral rulings on the juror issues. *See* Circuit Rule 30(b). After the appellee brought this omission to the court's attention, Griffin moved to supplement the appendix. Although we initially granted Griffin's motion, after receiving the appellee's motion to reconsider, we vacated the appellant's corrected brief, reinstated his original deficient filing, and allowed him to file the omitted rulings as a supplement to his opening brief. R. 32. We deferred ruling on the treatment of the omitted materials so that the merits panel could consider the issue. We now grant Plaintiff's Motion to Correct Inadvertent Omissions in his Short Appendix. R. 23. For each of the jurors challenged, Griffin cited to the transcript and in a few instances quoted the district court's ruling in the body of his brief, supporting his claim that the omissions from the short appendix were in fact inadvertent.

verdict based on the district court's refusal to remove a juror only if the party challenging the ruling can demonstrate prejudice. *Fletcher*, 634 F.3d at 409.

### 1.

Griffin exercised one of his three peremptory challenges to eliminate juror Mahoney from the jury pool, and so she was not part of the panel that ultimately decided the case. Because Mahoney did not participate in deciding the case, Griffin cannot demonstrate prejudice from the district court's refusal to remove her for cause. *Fletcher*, 634 F.3d at 409 (no prejudice shown when allegedly biased juror served as an alternate who did not participate in deliberations or assist in deciding the case). "[O]ur focus at this stage must be on the impartiality of the jury that actually sat, not on [the juror] who was struck." *United States v. Lott*, 442 F.3d 981, 984 (7th Cir. 2006). *See also United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000); *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). Because Mahoney was not a member of the jury that decided the case, the court's refusal to excuse her for cause could not have prejudiced Griffin unless the loss of that peremptory challenge somehow harmed him.

But Griffin did not make any argument in the district court or in his opening brief on appeal regarding the loss of a peremptory challenge. Although Griffin used all three of his available peremptory challenges, he never claimed that he was wrongly deprived of the use of a peremptory challenge by the district court's refusal to remove Mahoney for cause. More precisely, Griffin did

not raise this argument until his reply brief, and arguments raised for the first time in a reply brief are deemed waived. *Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011); *United States v. Wescott*, 576 F.3d 347, 354 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 1546 (2010). We therefore will not consider that claim on the merits.

## 2.

Griffin's next challenge for cause was to juror Carel. When the court asked Carel what she thought in general of police officers, Carel responded that they have a "really tough job," and a "dangerous job." Tr. at 84-85. The court then asked, "Do you believe that if an individual is a victim of excessive force which causes injuries, that a person should be able to sue the police officer for the excessive force if the evidence shows that?" Carel replied, "I guess if the evidence shows that, yeah." Tr. at 85. The court asked Carel whether she would be able to suspend her judgment and not make up her mind until she heard everything, and whether she would be able to remain neutral until all of the evidence was in. She replied that she "would try, certainly." Tr. at 86. She explained that she worked on a busy corner where she could see the police make stops. She added that she had customers and friends who were police officers, that she sometimes saw the police get aggressive with persons who were breaking the law, but that the law breakers sometimes had weapons and she was glad that the police were aggressive in their enforcement of the law. The court then sought to clarify her answer,

asking whether, "in this particular case, you would be able to listen to all the testimony, and if the evidence convinced you that the defendant—that is, the police officer—used excessive force which caused injury to the plaintiff, then you would have no problem awarding damages, money to them?" Carel replied, "I guess if the money is going to go for bills, but if the money is going to just go for—I'm not sure. Do you know what I'm saying?" Tr. at 86-87. Carel then clarified that she could not judge because she did not have the evidence. With this clarification, the court asked once again whether she could award money damages to the plaintiff if she was convinced by the evidence that the police officer was wrong and caused injuries, and she answered an unequivocal, "Yes." The court then asked if she was convinced by the evidence that the officer had not used excessive force, whether she would be able to send the plaintiff home with nothing, and she again answered with an unequivocal "Yes." Tr. at 87.

After this exchange with the court, Griffin's counsel questioned Carel directly. In particular, he asked what type of evidence she would like to see in an excessive force case. Carel said it depended on the case. Tr. at 95. Counsel then posited that if the police officer said one thing, and the fourteen-year-old plaintiff said another, would Carel "start out saying, Well, I'm going to believe the police officer, why would he lie?" Carel responded, "Most likely." Tr. at 96.

When challenging Carel for cause, counsel for Griffin told the court, "I thought she said that she wanted

real evidence, that if it was just—it had to be bills and records and evidence that's concrete rather than testimony." Tr. at 141. The court stated that although Carel said she would expect that kind of evidence, she did not say she could not award damages in the absence of such evidence. Counsel for Griffin then added, "I think she said she couldn't be fair." Tr. at 141. The court then denied the challenge for cause. On appeal, Griffin contends that Carel indicated that she would give more credit to the testimony of a police officer, and that the court never asked her if she could set aside her bias in favor of police officers and decide the case fairly and impartially. Bell contends that Griffin waived this particular challenge by not raising it below, but we disagree. In addition to his contention that Carel wanted hard evidence, Griffin's counsel also objected to Carel on the ground that she said she "couldn't be fair." In the context of the back-and-forth discussion between counsel and the district court, it is clear that the court understood Griffin's objection as relating to the juror's supposed preference for the testimony of a police officer. We therefore consider the argument on the merits.

Carel, of course, never said that she could not be fair. At most, she indicated that her first inclination, if faced with conflicting stories from a police officer and a fourteen-year-old boy, would "most likely" be to believe the officer. After Carel said her initial inclination would be to believe the police officer, Griffin's counsel asked:

> And would you consider that, Well, Shaquille Griffin, he is here in court because he wants money from

> the police officer as a reason why you would say, I am not going to believe what Shaquille says?

Tr. at 96. Carel replied, "I don't know that." Tr. at 96. The prior careful questioning from the trial court judge established that Carel also said that she could not judge whether she could award damages without hearing the evidence. She also clarified that she could award damages if the evidence proved that the officer used excessive force and caused injuries to the plaintiff. In light of her answers to all of the questions, we cannot say that the district court abused its discretion in finding that Carel was not a biased witness who should be excluded for cause.

Carel's responses to the questions do not resemble those of the juror in *Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001), a case on which Griffin relies in part. In *Thompson*, the plaintiff brought a race discrimination case against her employer. A juror who owned a business expressed her belief that employees sometimes bring lawsuits against their employers just because they did not get something that they wanted from the employer:

> I think I bring a lot of background to this case, and I can't say that it's not going to cloud my judgment. I can try to be as fair as I can, as I do every day.

*Thompson*, 248 F.3d at 624. After conceding that she had this bias, and that it would cloud her judgment, the court never clarified whether the juror could set aside her beliefs and follow the court's instructions on the law. We remarked that "[t]he question in this case was

not whether [the juror's] belief that some claims against employers are spurious was true or false . . . but whether this belief would somehow impede her in giving due weight to the evidence and following the judge's instructions." 248 F.3d at 626. Because the juror expressly said that her prior experience would cloud her judgment, we found that the court should have asked her whether she would follow its instructions on the law and suspend judgment until she heard all of the evidence.

In the instant case, Carel resisted giving definitive answers to questions on how she would decide the case because she did not yet have the evidence. We think Carel's answers more closely resembled those of the jurors in *United States v. Ricketts*, 146 F.3d 492 (7th Cir. 1998). In that case, the defendants were accused of participating in a prison riot. During *voir dire*, the potential jurors were asked whether they would give more weight to the testimony of a prison guard than an inmate. 146 F.3d at 495. Nine jurors indicated that they would listen more to the guards. We found that the record was inadequate to establish that the jurors were biased in a way that required their exclusion from the jury:

> In the abstract, it is certainly not unreasonable for an ordinary person to say she would generally tend to believe a prison guard over a prison inmate. But that certainly doesn't mean that in a given case, after hearing sworn testimony under oath and considering all the facts and circumstances, that that

same juror would automatically believe a given guard over a given inmate. Generalized questions of the sort asked here are a slim basis upon which to base a challenge for cause.

*Ricketts*, 146 F.3d at 496. In *Thompson*, we clarified that the problem in *Ricketts* was that a tendency to believe guards over inmates was not itself a sign of bias but was simply indicative of a prior belief. *Thompson*, 248 F.3d at 625. We noted a critical difference between a prior belief and a bias in the sense that requires disqualification of a juror or judge:

Everyone brings to a case a set of beliefs that may incline him in one direction or another. A person told that X had been indicted, and asked whether he thought X guilty, might reply that he thought X probably was guilty because few innocent people are indicted. That would be a prior [belief]. It would be a bias only if it were irrational or unshakable, so that the prospective juror "would be *unable* to faithfully and impartially apply the law," *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985) (emphasis added), would be, in other words, "adamant," *Fleenor v. Anderson*, 171 F.3d 1096, 1099 (7th Cir. 1999)—in our hypothetical if, for example, the person added, "Nothing will ever convince me that the government would indict an innocent person."

*Thompson*, 248 F.3d at 625. In this case, although Carel expressed an initial inclination that police officers are more credible than teenagers, she never expressed an

irrational or unshakeable bias that indicated an inability or unwillingness to faithfully and impartially apply the law. Instead, she tried to qualify her answers by indicating that she could not say how she would rule without hearing the evidence. That is the opposite of bias, and the trial court did not abuse its discretion in refusing to strike Carel for cause. *See also United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1475 (2011) (when a prospective juror fails to express herself carefully or consistently, the trial judge is best situated to determine competency to serve impartially).

**3.**

Griffin also sought to strike juror Nadine Maamari for cause. When the district court asked how she felt about police officers in general, Maamari replied that they "do a difficult and dangerous job." Tr. at 70. The court also asked whether she believed that police officers sometimes use excessive force against citizens. Maamari replied, "We have seen it on the news. It does happen." She confirmed that she thought money damages were appropriate to redress injuries from excessive force, but that she would also send the plaintiff home with nothing if he failed to prove his case. Tr. at 70. The court further asked, "[W]ould you be able to suspend judgment in this case and listen to all the evidence, keep an open mind until all of the evidence has been presented?" Maamari answered, "I hope so, yes." Tr. at 71. Finally, the court asked, "And if once I give

you the instructions on the law to apply to the facts, do you believe you'd be able to apply that law even though you don't totally agree with the law?" Maamari answered, "Yes." Tr. at 71-72.

Griffin's counsel later asked a number of follow-up questions. Counsel asked Maamari whether she would say that a police officer is probably telling the truth because he is a police officer, and Maamari answered, "No." The following exchange then occurred:

> Counsel:   Would you think that a police officer must have had a good reason to do whatever he tells you he did because he is a police officer?
>
> Maamari:   I would—could you rephrase this? Or repeat it, please?
>
> Counsel:   You are going to hear testimony, you are going to be asked to resolve credibility, who is telling the truth. Would you be— would you start out—would you analyze that question by thinking—by thinking to yourself, Well, the police officer must have had a reason to do whatever he did, he didn't just beat this kid up for no reason? Would you think that?
>
> Maamari:   I probably would. I probably would.
>
> Counsel:   And that would make you more likely to say, Well, the officer is telling the truth because he must have had a good reason to do what he did?

Maamari:    You, know, as I am hearing your questions and answers, it's getting more and more confusing because we are not going to hear just his side of the story and Shaquille's side of the story. I mean, there must be some evidence and something more to it than just hearing—

Counsel:    Well, you will be able to decide that if you are selected as a juror after you hear all the testimony. If that's all you hear, the police officer and Shaquille, am I right that you'd be more likely to say the police officer—

Maamari:    No. You are not right. I am very, very uncomfortable in making a decision.

Counsel:    Would you give more weight to what the police officer said because he is just doing his job, he must have had a reason [for] whatever he did?

Maamari:    Probably.

Tr. at 117-19.

Griffin challenged Maamari on the ground that "she could not be fair." Tr. at 139-40. Counsel again indicated that he intended to challenge for cause any juror who said they would give more weight to the testimony of a police officer than to a fourteen-year-old student. The court disagreed that any juror had expressly indicated that they would prefer the testimony of a police officer just because that person was a police officer. Moreover, the court remarked:

I believe I asked all of them that—whether you would keep an open mind, listen to all of the evidence and the court's instruction before making up your mind as to what the verdict should be, and they all said yes.

Tr. at 140.

Maamari, like Carel, indicated a prior belief that a police officer would probably be more credible than a teenager but she also indicated that she would keep an open mind and judge the case by the evidence and by the law as stated by the trial court. She did not evince an irrational or unshakeable bias that would prevent her from ruling impartially on the case. *Thompson*, 248 F.3d at 625. And, like Carel, she indicated that she would keep an open mind and not make up her mind until she heard all of the evidence. In light of all of the answers that Maamari gave to the questions of both the court and counsel, we cannot say that the court abused its discretion in declining to strike Maamari from the jury for cause.

### B.

Griffin next challenges the district court's rulings that he could not use the still photographs that he had extracted from the video in his case-in-chief, in his cross-examination of defense witnesses, or to explain to the jury how he refreshed his recollection about certain facts before testifying. We review the district court's evidentiary rulings for abuse of discretion. *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 475 (7th Cir.

2010); *Common v. City of Chicago*, 661 F.3d 940, 946 (7th Cir. 2011).

Griffin initially sought to introduce the entire two-minute video, but on appeal complains only that he was unable to introduce still photographs from the video. The district court's ruling initially focused on the full video, but the court found that its reasoning was applicable to still photos taken from the video as well. The court excluded the video because (1) Griffin was unable to authenticate the video with the testimony of the person who made it; and (2) the video was unduly prejudicial because it showed only a small part of the confrontation. The court excluded the still photos that had been extracted from the video for the same reason the court prohibited the use of the video itself: Griffin lacked any witness who could authenticate the images, and the selective presentation of the images was unduly prejudicial. Griffin contends that the court erred when it required Griffin to produce the person who created the video in order to authenticate it. Griffin argues that he himself could have authenticated the video. Griffin does not challenge the court's ruling that photos were unduly prejudicial.

Griffin's failure to challenge the district court's alternate reason (undue prejudice) for excluding the photos is fatal to his claim of error. When a district court gives two independent, dispositive reasons for ruling against a party, and the party challenges only one of those grounds, any challenge to the alternate basis is waived and we may affirm. *Hess v. Reg-Ellen Machine Tool Corp.*,

423 F.3d 653, 664-65 (7th Cir. 2005); *United States v. Zuniga-Lazaro*, 388 F.3d 308, 314 (7th Cir. 2004); *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 823 (7th Cir. 2001).

But even if we were to consider Griffin's claim that the court erred in its finding that Griffin could not authenticate the video or the still photos extracted from the video without the videographer, we would still affirm. According to Griffin's lawyer, the two-minute video was e-mailed to him by Heather Brown, another student at the school who knew Griffin. Counsel could not say whether the video was taken with a cell phone or a camcorder, and conceded that there was no date or time stamp on the video. Nor could he verify if the video had been altered at any time. He affirmed that the video portrayed only a small part of the incident. The still photos, of course, displayed even less of the incident than the two-minute video, and even more selectively. Griffin contends that none of that information was required because he could have testified that the photos were what he claimed them to be; his testimony, he argues, is sufficient for authentication under Federal Rule of Evidence 901(b)(1). That Rule, titled "Testimony of a Witness with Knowledge," provides that "[t]estimony that an item is what it is claimed to be" is sufficient to satisfy the requirement of authenticating or identifying an item of evidence. But Griffin was not a "witness with knowledge." By his lawyer's own admission, he could not say how the video was made, or whether it had ever been altered. There were many valid reasons to call into question the authenticity of the video and still photographs, and many questions about the video that could

be answered only by the student who produced the recording. The court did not abuse its discretion in requiring Griffin to produce the maker of the video before allowing admission of still photos extracted from it.

## C.

We may dispense with Griffin's remaining issue in short order. He objected to Officer Bell's testimony regarding police department rules on making arrests. Even if it was error to allow a brief reference to compliance with departmental procedures, Griffin fails to explain how this error prejudiced him in a manner that would require a new trial. "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. Evidentiary errors satisfy this standard only if there is a significant chance that they affected the outcome of the trial. *Mihailovich v. Laatsch*, 359 F.3d 892, 913 (7th Cir. 2004). Griffin does not argue that admitting this evidence affected the outcome of the trial, and there is thus no basis for his claim for a new trial.

AFFIRMED.